IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KARL GRANT LOSEE,<br><br>     Plaintiff,<br>v.<br><br>C. GALLEGOS et al.,<br><br>    Defendants. | **MEMORANDUM DECISION & ORDER**<br><br>Case No. 2:11-cv-00080-TC<br><br>Judge Tena Campbell |

Plaintiff, Karl Grant Losee, a Utah State Prison (USP) inmate, filed this *pro se* civil rights suit, s*ee* 42 U.S.C.S. § 1983 (2014), *in forma pauperis*, *see* 28 U.S.C.S. § 1915(b). Before this Court are Defendants' Motions for Summary Judgment.

## ANALYSIS

### I. Background

Plaintiff's Second Amended Complaint asserts thirty-five claims against fifteen defendants. Plaintiff brought this suit against two contract attorneys (used by USP to give legal help to inmates) and USP officials. Plaintiff alleges civil rights claims, including denial of access to the courts, denial of the right to grieve, improper handling of grievances, mail theft, cruel and unusual punishment based on cell conditions, denial of books, USP's use of a "banned publications list," denial of a magazine, obstruction of legally privileged mail, and retaliation. (*See* Second Am. Compl., Doc. 8.) The contract attorneys' Motions to Dismiss were granted on March 25, 2013, on the basis that the contract attorneys were not state actors for purposes of

§ 1983. (Mem. Decision and Order, Doc. 124, at 5-6.) Only the state defendants (Defendants) remain.

The United States Marshals Service completed service of process upon Defendants. (Doc. 16.) After filing answers, Defendants were ordered to file a *Martinez* report addressing Plaintiff's claims.[1] Defendants filed a bifurcated *Martinez* report, part on November 11, 2012, and the other part on January 11, 2013. (*See* Docs. 85, 102–10.) The *Martinez* report included Defendants' sworn declarations and Plaintiff's extensive prison grievance and mail records.

Plaintiff objected to the bifurcation of the *Martinez* Report, (Docs. 88, 96), moved to strike the *Martinez* Report, (Docs. 98, 116), requested an evidentiary hearing, (Doc. 117), and asked for additional discovery, (Docs. 116, 138, 143).

The Court followed up on these requests by telling Plaintiff that if he could "identify additional specific items of discovery which are necessary for him to properly respond to Defendants' summary judgment motions he may file a detailed discovery motion within twenty-one (21) days" of the Court's March 25, 2013 Memorandum Decision and Order. (Doc. 124, at 7–8.) Plaintiff was told that in his discovery request he must specifically identify each item of discovery sought and clearly explain how it is relevant to the summary judgment issues. (*Id.* at 8.) Plaintiff was warned that failure to make such a showing would result in denial of discovery of that item. (*Id.*)

Plaintiff filed a Motion for Discovery, (Doc. 126), a Motion to Obtain Depositions under Written Questions, (Doc. 138), and a Motion to Compel Discovery, (Doc. 143). Defendants

---

[1] In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), the Tenth Circuit approved the practice of district courts ordering government officials to prepare a report to be included with the pleadings in cases when a prisoner alleges a constitutional violation by such officials.

objected to Plaintiff's requests because they did not comply with the Court's instructions as contained in its March 25, 2013 Memorandum Decision and Order. (Docs. 132, 144.)[2] The Court agrees that Plaintiff has not complied with its order as to further discovery, and therefore denies Plaintiff's discovery requests.

Defendants filed two Motions for Summary Judgment, one on November 15, 2012, and one on January 11, 2013, based on the evidence presented in their *Martinez* Report. (Docs. 86–87, 101.) The first Motion addressed the Eighth Amendment claims, and some First Amendment claims regarding those Eighth Amendment claims. The second Motion addressed the remaining First, Sixth, and Fourteenth Amendment claims. Plaintiff responded multiple times. (Docs. 90, 94, 95, 115, 130, 140.) Defendants' summary judgment motions are now fully briefed and properly before the Court.

## II. Summary Judgment Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant, asserting that there is not a genuine dispute about material facts, must support his assertion "by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or . . . showing that . . . an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c). A main purpose of the rule regarding summary judgment "is to isolate and dispose of factually unsupported claims or

---

[2] Defendants responded to Plaintiff's Motion to Obtain Depositions under Written Questions in document number 132.

defenses . . . ." *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Id*. at 325. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id*. Federal Rule of Civil Procedure 56 requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted). The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). Mere allegations and references to the pleadings will not suffice. However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### III. Facts

1.     From December 2008 through March 2010, Plaintiff was housed in the B-North housing block at Utah State Prison Wasatch Facility ("B-North"). (Gallegos Decl., ¶ 8, Ex. 6 to Defs.' *Martinez* Report.)

2.      During that time, Plaintiff filed fifteen grievances for various issues. (Casper

Decl., ¶ 26, Ex. 4 to Defs.' *Martinez* Report.)

**A. Inmate Housing Temperature Issues**

3.      Several of Plaintiff's grievances concerned B-North temperatures, the officers'

handling of related complaints, and alleged retaliation for the complaints and grievances.

(*See* Grievances 990870662, 990871174, 990874588, 990874589, 990875014, Ex. 19 to

Defs.' *Martinez* Report.)

4.      Plaintiff's first grievance about the cold in B-North was filed on December 24,

2008. (Grievance 990870662, Utah Department of Corrections (DOC) – 000293, Ex. 19

to Defs.' *Martinez* Report.) It alleged that the second and third tiers of B-North had no

heat, and that maintenance had been called twice but had not fixed things. (*Id.*)

5.      The inmate cells are on the second and third tiers. (Gardner Decl., ¶ 9, Ex. 7 to

Defs.' *Martinez* Report.)

6.      On December 24, 2008, the thermostat controlling the temperature on the second

and third tiers was replaced and the temperature on the tiers was adjusted. (Level One

Grievance Staff Response, DOC – 000294, Ex. 19 to Defs.' *Martinez* Report.)

7.      Plaintiff filed a grievance on February 21, 2009, complaining that the heat in the

classroom and dayroom had been turned off. (Grievance 990871174, DOC – 000303, Ex.

19 to Defs.' *Martinez* Report.)

8.      The heat had been turned off because a valve actuator in the heating system broke

on February 6, 2009. (Level One Grievance Staff Response, DOC – 000304, Ex. 19 to

Defs.' *Martinez* Report.) Maintenance repaired and reinstalled the actuator on February 20, 2009. (*Id.*)

9.　　Plaintiff filed a grievance on December 4, 2009, alleging that the temperature in B-North dropped whenever Officer Gallegos worked, and that Officer Gallegos refused to call maintenance. (Grievance 990894589, UDOC – 000343, Ex. 19 to Defs.' *Martinez* Report.)

10.　　Plaintiff stated in his grievance that because of the cold temperatures, inmates were "forced to wear thermals, coats and/or hats inside the housing unit of B-North." (*Id.*)

11.　　Plaintiff filed a grievance on December 13, 2009, claiming that Officer Gallegos refused to call maintenance about the heating problems. (Grievance 990874588, DOC – 000334, Ex. 19 to Defs.' *Martinez* Report.)

12.　　During this time, the temperature outside the prison was very cold, which caused temperatures inside the prison to drop. (Gardner Decl., ¶ 13, Ex. 7 to Defs.' *Martinez* Report.)

13.　　A single thermostat controlled the temperature in the classroom and dayroom areas at that time. (*Id.* ¶ 10.)

14.　　During all times relevant to Plaintiff's Complaint, the temperatures in the cells located on the second and third tiers were controlled exclusively by maintenance. (Gardner Decl., ¶ 10, Ex. 7 to Defs.' *Martinez* Report.) Housing officers could not adjust the cell temperatures. (*Id.*)

15.     The construction of the building causes the lower levels of B-North to get cold when it is cold outside, because the building is constructed of concrete with no insulation between the inside and outside of the building. (*Id.* ¶ 8.)

16.     The B-North night officers turn the temperature in the dayroom and classroom up to 85 degrees to overcome the heat-loss caused by the building's construction. (Gallegos Decl., ¶ 11, Ex. 6 to Defs.' *Martinez* Report.)

17.     Because the heat was turned up overnight, other areas of the housing unit got uncomfortably hot.  (Rigby Decl., ¶ 15, Ex. 11 to Defs.' *Martinez* Report.)

18.     Daytime housing officers turn the temperature in the dayroom and classroom back down when they arrive to alleviate the discomfort caused by the high heat in these rooms overnight.  (Gallegos Decl., ¶ 12, Ex. 6 to Defs.' *Martinez* Report.)

19.     In the first few weeks of December 2009 every inmate in B-North was issued an extra blanket, (Gardner Decl., ¶ 12, Ex. 7 to Defs.' *Martinez* Report), and could receive another blanket if they were still too cold.  (*Id.* ¶ 11.)

20.     All inmates had coats and hats for colder weather.  (Rigby Decl., ¶ 17, Ex. 11 to Defs.' *Martinez* Report.)

21.     Upon hearing about the complaints in the dayroom and classroom, Sergeant Rigby turned up the heat in those rooms, and put a work order in for maintenance to address the issue. (Rigby Decl., ¶¶ 18–19, Ex. 11 to Defs.' *Martinez* Report.)

22.     After multiple complaints about the temperature, Officer Gallegos asked Captain Gardner to evaluate the heat in the B-North dayroom and classroom. (Level One Grievance Staff Response, DOC - 000336, Ex. 19 to Defs.' *Martinez* Report.)

23.     Captain Gardner inspected the area around 10:00 a.m. and the temperature was sixty-eight degrees. (Gardner Decl., ¶ 15, Ex. 7 to Defs.' *Martinez* Report.)

24.     Officer Gallegos never set the thermostats that control the temperature in the dayroom and classroom below seventy degrees during this time. (Gallegos Decl., ¶ 13, Ex. 6 to Defs.' *Martinez* Report.)

25.     Officer Gallegos told inmates he would keep the temperature at a level that was most comfortable for everyone.  (Gallegos Decl., ¶ 14, Ex. 6 to Defs.' *Martinez* Report.)

26.     Officer Gallegos had several inmates complaining that it was too hot, as well as inmates like Plaintiff complaining that it was too cold.  (*Id.* ¶ 15.)

27.     Plaintiff filed a grievance on December 4, 2009, alleging that Officer Gallegos refused to call maintenance or put in a work order about the dayroom and classroom heat. (Grievance No. 990874589, DOC - 000343, Ex. 19 to Defs.' *Martinez* Report.)

28.     Plaintiff filed another grievance on December 13, 2009, alleging that several inmates grieved Officer Gallegos for refusing to call maintenance about the temperature problem, but that Officer Gallegos gathered the grievances from the mailboxes, took them to the officer station, and (along with Officer Rigby) opened and read them. (Grievance 990874588, DOC - 000334, Ex. 19 to Defs.' *Martinez* Report; Second Am. Compl., Count 26, Doc. 8.)

29.     Plaintiff alleges that Sergeant Rigby told the inmates that their grievances were no good and should be picked up from the officer's station. (*Id.*)

30.     Due to the fact that the December 13 grievance is numbered before the December 4 grievance, Plaintiff believes that Captain Gardner, Sergeant Rigby, and Officer Gallegos held his grievances. (*Id.*)

31.     Defendants state that after gathering the mail on the morning of December 10, 2009, Officer Gallegos noticed that there were several grievances, and told Sergeant Rigby that the grievances were probably about the heat. (Rigby Decl., ¶¶ 21–22, Ex. 11 to Defs.' *Martinez* Report.) Sergeant Rigby turned the heat up and called maintenance. (*Id.* ¶¶ 23–24.)

32.     Sergeant Rigby then reminded the inmates of the grievance policy requirement "to make and to document reasonable attempts to resolve complaints informally." (Rigby Decl., ¶ 25, Ex. 11 to Defs.' *Martinez* Report; Inmate Grievance Policy FDr02, Ex. 15 to Defs.' *Martinez* Report.) Sergeant Rigby also told the inmates they could withdraw their grievances if they wanted but that they did not have to. (Rigby Decl., ¶ 26, Ex. 11 to Defs.' *Martinez* Report.)

33.     All inmates but Plaintiff withdrew their complaints. (Gallegos Decl., ¶ 19, Ex. 6 to Defs.' *Martinez* Report.) And Plaintiff's grievances were sent out with the remaining mail on the morning of December 10, 2009. (*Id.* ¶ 20.)

34.     Housing officers did not open any of the grievances. (*Id.* ¶ 21; Rigby Decl., ¶ 27, Ex. 11 to Defs.' *Martinez* Report.)

35.     Plaintiff's grievances about the temperature at B-North were assigned to the maintenance department. (Gallegos Decl., ¶ 22, Ex. 6 to Defs.' *Martinez* Report.)

36.     Plaintiff's grievances were returned to the Data Terminal Operator by maintenance and were then reassigned to the housing officers.  (Gardner Decl., ¶ 19, Ex. 7 to Defs.' *Martinez* Report.)

37.     On February 16, 2010, Billie Casper told Plaintiff that he could resubmit one of the grievances he believed was lost and that she would waive the time frame to submit the level-one grievance under these circumstances.  (Grievance Problem Form, DOC - 000355, Ex. 19 to Defs.' *Martinez* Report.)

## B. Alleged Retaliation

38.     B-North houses inmates who need help becoming literate and literate inmates who work as tutors.  (Gardner Decl., ¶ 21, Ex. 7 to Defs.' *Martinez* Report.)

39.     The literacy program is administered by the Canyons School District and their personnel, in this case Susan Anderson.  (*Id.* at 22.)

40.     Despite having a negative performance review for falsifying his time sheet in February 2009, Plaintiff's job rating had been generally good until December 2009.  (*Id.* ¶ 23.)

41.     During January 2010, officers began expressing concern that Plaintiff was getting paid as a tutor for reading a book or doing personal paperwork.  (*Id.* ¶ 24.)

42.     Due to these concerns, Plaintiff was moved off of B-North and fired as a tutor by Captain Gardner on January 4, 2009.  (*Id.* ¶ 25.)

43.     On January 5, 2010, Plaintiff was moved back to B-North and reinstated as a tutor, at the discretion of Deputy Warden Bussio, trying to give Plaintiff another chance.

(*Id.* ¶ 26; Offender Location History, Ex. 25 to Defs.' *Martinez* Report; Bussio Decl., ¶ 9, Ex. 2 to Defs.' *Martinez* Report.)

44.     On February 25, 2010, Plaintiff was reprimanded for putting his feet on the desks in the classroom.  (C-Note Log, DOC - 000393, Ex. 20 to Defs.' *Martinez* Report.)

45.     On March 11, 2010, Plaintiff conducted a class on how to write grievances instead of following the tutoring plan outlined by Canyons School District.  (*Id.*)

46.     On March 12, 2010, Plaintiff was playing Scrabble with another inmate during the time he was supposed to be tutoring inmates. (*Id.*)

47.     When confronted by housing officers, Plaintiff stated that Scrabble was a form of tutoring and that he expected to be paid. (*Id.*)

48.      On March 17, 2010, Susan Anderson met with housing officers about problems with Plaintiff.  (C-Note Log, DOC - 000392, Ex. 20 to Defs.' *Martinez* Report.)

49.     Susan Anderson told housing officers that Plaintiff refused to take required testing as well as follow her other directions. (*Id.*)

50.     Due to recent problems, Susan Anderson and housing officers determined that Plaintiff needed to be let go from his tutoring job.  (*Id.*)

51.     Susan Anderson also met with Deputy Warden Bussio on March 17, 2010, and told him of her dissatisfaction with Plaintiff's job performance, and asked that Plaintiff be removed from his tutoring job. (Bussio Decl., ¶¶ 10–11, Ex. 2 to Defs.' *Martinez* Report.)

52.     On March 18, 2010, Plaintiff was terminated from his tutoring job. (C-Note Log, DOC - 000392, Ex. 20 to Defs.' *Martinez* Report.)

## C. Plaintiff's Privileged Mail

53.     Many times between October 9 and November 6, 2007, Plaintiff tried to mail the same letter, marked as "privileged legal mail."  (Second Am. Compl., 11-14, Counts 1-4, Doc. 8.)  However, it was addressed to his mother, Marilyn Losee, and, one time, Losee also requested both registered mail and certified mail.  (Galetka Decl., ¶¶ 12-15, 21, 26, Ex. 5 to Defs.' *Martinez* Report.)  The envelope was opened and returned to him, with the reason that Ms. Losee is not a legal entity to which privilege is accorded, and it was also returned so that Plaintiff could clarify which mail service he would like to use. (*See id.*)

54.     On December 3, 2007, Plaintiff mailed an envelope that was returned because it did not include his full name, offender number, housing facility, and the city, state, and zip code.  (*See* Galetka Decl., ¶ 35, Ex. 5 to Defs.' *Martinez* Report.)

55.     On August 26, 2008, the Mail Unit processed mail from Plaintiff with a money transfer form attached for postage.  (*Id.* ¶¶ 78-79.)  DOC Offender Trust Accounting records indicate that Plaintiff was charged $1.51.  (*Id.* ¶ 79.) According to the Outgoing Privileged Mail Correspondence Log for August 26, Plaintiff did not send privileged mail out.  (*Id.* ¶ 80.)

56.     Plaintiff did not receive privileged mail on March 4, 2009.  (C-Notes Log, DOC 000396, Ex. 20 to Defs.' *Martinez* Report.)  Plaintiff did not file a grievance about the opening of privileged mail on March 4, 2009, and the mailroom staff has no record or recollection of mail marked "Privileged" as being opened on March 4, 2009. (Galetka Decl. ¶ 91, Ex. 5 to Defs.' *Martinez* Report.)

57.     On April 23, 2009, Plaintiff received a letter from the Salt Lake County Sheriff's Office.  (Second Am. Compl., 24-25, Count 16, Doc. 8.)  The envelope was marked as "confidential privileged health information enclosed."  (*Id.*)  The envelope was opened away from Plaintiff because the Sheriff's Office is not considered a legal entity. (Galetka Decl., ¶¶ 94-102, Ex. 5 to Defs.' *Martinez* Report.)

58.     According to DOC records, Plaintiff did not receive privileged mail on or around July 13, 2010.  (Galetka Decl., ¶¶ 104-105, Ex. 5 to Defs.' *Martinez* Report; C-Notes Log, DOC 000395, Ex. 20 to Defs.' *Martinez* Report.)

### D. Delay of Plaintiff's Mail

59.     On February 28, 2008, Plaintiff tried to mail an envelope.  (Galetka Decl., ¶ 45.)  It was stamped as "inmate mail" by the Mail Unit because when it was received the return address was illegible.  (*Id.* ¶ 46.)  The envelope was returned by the post office because it was marked "inmate mail."  (Second Am. Compl., 16-17, Count 8, Doc. 8.)

60.     Plaintiff received an envelope from the Office of the Attorney General (AG) on August 19, 2008, (Second Am. Compl., 20, Count 11, Doc. 8), that had been sent on August 13.  (Galetka Decl., ¶ 60, Ex. 5 to Defs.' *Martinez* Report.)

61.     The envelope from the AG was sent by inter-department mail.  (*Id.* ¶ 68.)  The Mail Unit stamped Plaintiff's mail as received on August 18.  (*Id.*)  The envelope was processed for delivery to Plaintiff the next working day.  (*Id.* ¶ 70.)

### E. Confiscation, Censoring, or Interference with Plaintiff's Mail

62.     Between December 1, 2009, and December 15, 2009, none of Plaintiff's mail was confiscated or censored.  (Galetka Decl., ¶¶ 81-92, Ex. 5 to Defs.' *Martinez* Report.)

63. The Mail Unit Records do not contain a Notification of Denied Mail form for a January 15, 2010 mailing to indicate that there was a problem with Marilyn Losee's mailing. (*Id.* ¶ 89.) Plaintiff alleges that a letter sent to him by his mother "held only two of the three legal documents that [she] had sent." (Second Am. Compl., 23, Count 13, Doc. 8.)

64. Plaintiff sent privileged mail on December 14, 2009, to John Borsos. (C-Notes Log, DOC 000393, Ex. 20 to Defs.' *Martinez* Report.) There is no record of a December 13, 2009 outgoing privileged mail. (*Id.*)

### F. Plaintiff's Grievances

65. Officer Galetka researched Plaintiff's grievance that his mail should have been accorded privilege, which Plaintiff has now raised to this Court in Count One of his Complaint, and concluded there was no evidence that the Mail Unit had opened a qualified outgoing privileged envelope. (*See* Galetka Decl., ¶¶ 8-14, Ex. 5 to Defs.' *Martinez* Report.)

66. Plaintiff's grievances about two incidents on October 29 and November 1, 2007, of an envelope being opened, were responded to in a single response because they dealt with the same issue. (Level One Staff Response to Grievance 990866526, DOC 000216, Ex. 19 to Defs.' *Martinez* Report.)

67. No record exists of a grievance about the November 6, 2007 incident of Plaintiff's alleged attempted mailing of "privileged legal mail" referred to in Plaintiff's Complaint as Count 4. (Galetka Decl., ¶¶ 27-28, Ex. 5 to Defs.' *Martinez* Report.)

68.     In May 2009, Plaintiff's grievance privileges were going to be suspended because of repeated grievances on the same or similar topic.  (Level 2 Response, Grievance 990871786, DOC 000311, Ex. 19 to Defs.' *Martinez* Report.)  Plaintiff "[had] been informed many times of what Department policy requires to have an envelope regarded as privileged communication requiring opening in [his] presence."  (*Id.*) But he "refus[ed] to accept this information . . . ." (*Id.*)

69.     Plaintiff filed a level-two grievance around September 2010.  (*See* Grievance Problem Form, Exs. to Compl., 30, Doc. 2.)  There was no record of a level-one grievance.  (*Id.*)  He was allowed to redraft his grievance and resubmit it.  (*Id.*) The seven-day time limit was waived so he could submit his grievance. (*Id.*)

### G. Plaintiff's Legal Materials

70.     Inmates are provided with a pouch marked "legal-privileged," in which they may keep confidential legal documents.  (Carlson Decl., ¶¶ 11, 14, Ex. 3 to Defs.' *Martinez* Report.)  Inmates may receive additional "legal-privileged" pouches.  (*Id.*)  Pouches marked as "legal-privileged" may be inspected, but the contents are not read.  (*Id.* ¶ 12.)

71.     On November 14, 2007, Plaintiff was relocated to a different housing unit and not allowed to take his property with him.  (Second Am. Compl., 14-15, Count 5, Doc. 8.) His property was inventoried and sent to the Property Unit for review.  (Carlson Decl., ¶ 16, Ex. 3 to Defs.' *Martinez* Report.)  Among Plaintiff's property was a seven-inch stack of paperwork and ten manila envelopes that were inspected and read.  (*Id.* ¶ 17.) There was no "legal-privileged" pouch.  (Inmate Property Inventory, DOC 000234, Ex. 19 to Defs.' *Martinez* Report.)

### H. Plaintiff's Books and Magazine

72.     Plaintiff was denied delivery of *Barron's Law Dictionary* because it was sent from "Music by Mail," which was not an approved book vendor.  (*See* Ex. 9 to Defs.' *Martinez* Report, DOC 000312.)

73.     DIO regulates inmate property, including the ordering of books, to prevent the introduction of contraband into the prison.  (Inmate Property Policy, DOC 000140, Ex. 17 to Defs.' *Martinez* Report.)  The introduction of contraband threatens the security, safety, order, and other DOC interests. (*Id.*)

74.     Plaintiff was denied a shipment of books around September 2009.  (Second Am. Compl., 28-29, Count 20, Doc. 8.)  The books were denied because one of the books, *Glamour Photography*, contained "many pages of exposed breasts and genitalia."  (Level 3 Staff Response, Grievance 990878810, DOC 000439, Ex. 19 to Defs.' *Martinez* Report.)  "[T]here [were] also several pictures of bondage and sado-masochism."  (*Id.*)  The entire shipment of books was denied because it is prison policy that if one of the items of a shipment must be rejected, the entire package is rejected and returned to the sender.  (Galetka Decl., ¶¶ 87, 85, Ex. 5 to Defs.' *Martinez* Report.)

75.     Plaintiff requested *Interview* magazine.  (Galetka Decl., ¶¶ 116, 124, Ex. 5 to Defs.' *Martinez* Report.) His request was denied because that publication contains sexually explicit material and nudity.  (*See* Ex. 25 to Defs.' *Martinez* Report (filed under seal).)

76.     On January 4, 2010, Plaintiff was denied the legal self-help book, *The Prisoner's Guide to Survival*. It was denied because it was not bought using his inmate funds

account.  (Ex. 19 to Defs.' *Martinez* Report – DOC – 000129–000131; Carlson Decl., ¶¶ 30-36, Ex. 3 to Defs.' *Martinez* Report.)

77.     On October 1, 2010, Plaintiff filed a grievance that he was denied *The Prisoner's Guide to Survival* a second time on or around August 5, 2010, even though he had followed procedure to get it.  (Grievance 990877248, UDOC 000372, Ex. 19 to Defs.' *Martinez* Report.)  There is no denial form or other record that the book was denied on or about August 5, 2010.  (*Id.* at UDOC 000378.)  Records show that on September 7, 2010, Plaintiff received *The Prisoner's Guide to Survival*. (*Id.* Grievance 990877248 Property Receipt Form; DOC 000376, Ex. 19 to Defs.' *Martinez* Report.)

## I. Privileged Mail to Criminal Attorney

78.     On May 12, 2008, the postal letter rate rose from $0.41 to $0.42.  (Galetka Decl., ¶ 54, Ex. 5 to Defs.' *Martinez* Report.)  The Inmate Funds Accounting Office communicated erroneously that the Mail Unit would cover the $0.01 increase for one week.  (*Id.*)  Plaintiff sent mail on May 13, which was returned to him because of insufficient postage.  (*Id.* at 57.)

79.     The privilege log does not indicate that Plaintiff received any privileged mail on December 17, 2010, or January 14, 2011.  (Galetka Decl., ¶¶ 106-107, 111-115, Ex. 5 to Defs.' *Martinez* Report.)

## J. Denial of Plaintiff's Magazine

80.     Plaintiff requested *Interview* magazine.  (Galetka Decl., ¶ 124, Ex. 5 to Defs.' *Martinez* Report.) His request was denied because that publication contains sexually explicit material and nudity.  (*See* Ex. 25 to Defs.' *Martinez* Report (filed under seal).)

81.     Plaintiff got notice that the magazine was denied when he received the "Notice of Denied Money Instruments/Mail/Property" form. (Second Am. Compl., 29, Count 21, Doc. 8; *id.* at 30, Count 22; Exs. to Compl., Attachment 7, Doc. 2.)

82.     Plaintiff also had a chance to appeal the decision. At the bottom of the "Notice of Denied Money Instruments/Mail/Property" form, it states: "TO THE INMATE: All items are returned. You may, however, appeal any decision through the institutional grievance procedure, FDr02."  (Exs. to Compl., Attachment 7, Doc. 2.)

## IV. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on each of Plaintiffs claims, asserting that Plaintiff has not presented sufficient evidence to show a constitutional violation.  Defendants further assert that even if Plaintiff can show a constitutional violation, they are entitled to qualified immunity because the relevant standard of care was not clearly established at the time of the alleged violations.  After explaining the relevant legal standard, the Court will address each of Plaintiff's claims.

### A. Eighth Amendment Standard

The Eighth Amendment does not outlaw cruel and unusual conditions.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment.  *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998).  For a plaintiff to succeed on an Eighth Amendment claim he must show that:  (1) his alleged deprivation, viewed objectively, is sufficiently serious; and (2) the prison official acted with deliberate indifference to the inmate's health or safety.  *Farmer*, 511 U.S. at 834.

Specifically, regarding temperature of inmate cells, to demonstrate an Eighth Amendment violation, an inmate must "show that conditions were more than uncomfortable, and instead rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety." *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (citation omitted). Such a showing will not be met "just because a low temperature forces a prisoner to bundle up indoors during the winter." *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997).

### B. Cold-Cell-Conditions Claim

Plaintiff argues that Officer Gallegos showed deliberate indifference by ignoring Plaintiff's requests to adjust B-North's temperature. Plaintiff stated in his Response to Defendants' Motion for Partial Summary Judgment that "no extra clothing or blankets were issued to any inmate of B-North . . . ." (Pl.'s Resp. Defs.' Mot. Partial Summ. J., 3, Doc. 94.) Plaintiff rested his argument on the fact that Defendants "admit that the B-North housing unit has no insulation and that if it is cold outside the housing unit is also cold." (Pl.'s Resp. Defs.' Mem. Supp. Mot. Partial Summ. J., ¶ 4, Doc. 95.) Plaintiff is mistaken that such an admission is sufficient to support a finding of an Eighth Amendment violation.

Viewing the facts in the light most favorable to Plaintiff, Plaintiff's allegations do not support a finding of an Eighth Amendment violation. Plaintiff has failed to "show that conditions were more than uncomfortable, and indeed rose to the level of conditions posing a substantial risk of serious harm to inmate health or safety." *DeSpain*, 264 F.3d at 973. Even assuming that Plaintiff was not given an extra blanket or extra clothes, Plaintiff has not shown a substantial risk of harm to his health or safety. Plaintiff's Eighth Amendment claims are denied.

### C. First Amendment Standard and Claims

In his Second Amended Complaint, Plaintiff asserted his causes of action regarding his mail, legal materials, and grievances as violations of the Sixth Amendment and denials of access to the courts.  (*See, e.g.*, Second Am., Compl., Count 1, pp. 11–12, Doc. 8.)  However, the right of access to the courts is grounded in the First Amendment.  *See Davis v. Arkansas Valley Corr. Facility*, 99 Fed. Appx. 838, 841 n.6 (10th Cir. 2004) (unpublished) (citing *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (right of access to courts grounded in First Amendment)).

Plaintiff's First Amendment claims include allegations that his mail was delayed, stolen, or mishandled; his grievances were improperly handled; his legal materials were not treated properly; he was improperly denied books and a magazine; and USP maintains a "banned publications list."  The Court will set forth the appropriate standard for each of the individual claims, then analyze each in turn.

### i. First Amendment Standard: Inmate Mail

 "While 'correspondence between a prisoner and an outsider implicates the guarantee of freedom of speech,' the control of mail to and from prisoners is a necessary adjunct to penal administration."  *Gandy v. Ortiz*, 122 Fed. App'x 421, 422 (10th Cir. 2005) (unpublished) (citations omitted).  The Supreme Court in *Thornburgh* made it clear that a distinction still exists between incoming prison mail and outgoing prison mail.  *See Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).  That distinction revolves around the differing penological concerns with respect to outgoing and incoming mail.  The Court recognized that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials."  *Id.*

"Prison officials may open and inspect non-legal mail in the interest of jail security."

*Bedford v. Sharp*, No. 96-6230, slip op. at 1 (10th Cir. July 23, 1997) (citing *Wolff v. McDonnell,* 418 U.S. 539, 576-577 (1974)). "Although outgoing mail presents a lesser security risk to the prison than incoming mail, courts nevertheless have upheld inspection of both kinds of mail where the inspection is for the purpose of discovering contraband." *Id.* (citing *Smith v. Delo,* 995 F.2d 827, 830 (8th Cir.1993)).

Regarding legally privileged mail, it is paramount that the legally privileged mail be so marked so that it may be accorded privilege by a prison. "[I]nmates have a constitutionally protected right to have their *properly marked* attorney mail opened in their presence . . . ." *Al-Amin v. Smith*, 511 F.3d 1317, 1331 (11th Cir. 2008) (emphasis added).

To prevail on a First Amendment claim relating to the non-delivery or delay of mail or legal mail, an inmate "must show that non-delivery . . . resulted in actual injury by frustrating, impeding, or hindering his efforts to pursue a legal claim." *Wardell v. Maggard*, 470 F.3d 954, 959 (10th Cir. 2006) (internal quotation marks omitted) (changes omitted) (citing *Simkins v. Bruce,* 406 F.3d 1239, 1243 (10th Cir.2005)). "Conclusory allegations of injury in this respect will not suffice." *Id.* (citations omitted).

### ii. Plaintiff's Mail

The facts are not disputed as to what happened to Plaintiff's mail. The critical question is whether the facts constitute a violation of Plaintiff's constitutional rights. For the reasons set out below, the Court concludes that they do not.

Plaintiff alleges that his privileged legal mail was opened outside his presence (Second Am. Compl., Counts 1-4, 6, 12, 15, 16, 24, 31, Doc. 8); his mail was improperly delayed (*id.,*

Counts 8, 11); pages were wrongfully removed from letters he received (*id.*, Count 13); and letters to two law firms were intercepted and not sent by Officer Gallegos (*id.*, Count 24). Plaintiff has asserted his claims as violations of the First and Sixth Amendment. The Sixth Amendment aspect of Plaintiff's claims will be addressed below in section D.

For incoming or outgoing mail to be treated as privileged at USP, it must be addressed to or from an identifiable legal entity and must be marked as "privileged." (General Regulations for Privileged Mail, FDr03/08.00.) Plaintiff does not have a constitutional right to mail marked "privileged" that is not sent to a legal entity. If prisoners could simply write "privileged" on any piece of mail, and have it be exempt from screening, the entire mail system would be frustrated, and contraband, escape plans, or other dangerous materials could enter and exit USP freely.

Here, Plaintiff argues that mail correspondence with his mother, the Salt Lake County Sheriff's Office, and the Center for Constitutional Rights, was marked as privileged mail and should have been thus treated by the Mail Unit, but was not. Plaintiff has not met his burden at summary judgment to show that a trier of fact could characterize any of those pieces of mail as qualified legal mail. Plaintiff never offered the correspondence itself, even under seal, or described the contents in a manner sufficient to allow the Court to conclude that the mail was privileged. Plaintiff's argument, that his mail should be treated as privileged solely because it is so marked, is unpersuasive.

Similarly, Plaintiff's allegations regarding the delay of his mail fail to rise to the level of a constitutional violation. A letter from the AG's office was sent to Plaintiff on August 13, 2008, and arrived on August 19, 2008. A delay of a few days does not rise to the level of a

constitutional violation.  *Bruscino v. Pugh*, 232 Fed. App'x 763, 764 (10th Cir. 2007) (unpublished) (*citing Smith v. Maschner,* 899 F.2d 940, 943-44 (10th Cir.1990)).

As to Plaintiff's remaining First Amendment claims that pages were wrongfully removed from letters he received and that letters to two law firms were intercepted and not sent by Officer Gallegos, Plaintiff has failed to produce evidence to support his claims, and failed to argue an essential element:  an "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996) (involving First Amendment claim of inmate's access to law library or legal help).  Accordingly, Plaintiff's First Amendment claims about his mail are denied.

### iii. First Amendment Standard: Grievances

A plaintiff must show an actual injury to a non-frivolous legal claim to prevail on a claim that his First Amendment right of access to the courts was violated by the violation of internal prison grievance procedures.  *See Blum v. Fed. Bureau of Prisons*, No. 99-1055, slip op., at 5-6 (10th Cir. Aug. 23, 1999) (unpublished); *Esnault v. Burnett,* 83 Fed. App'x 279, 282 (10th Cir. 2003) (unpublished) (citing *Lewis,* 518 U.S. at 351–52).

This is because "[p]rison officials are not liable under § 1983 for denying or failing to act on grievances."  *Barnett v. Luttrell*, 414 Fed. App'x 784, 787 (6th Cir. 2011) (unpublished) (*citing Grinter v. Knight,* 532 F.3d 567, 576 (6th Cir. 2008)); *see also Gallagher v. Shelton,* 587 F.3d 1063, 1069 (10th Cir. 2009) (citing, *inter alia, Lomholt v. Holder,* 287 F.3d 683, 684 (8th Cir. 2002) (*per curiam*) ("[Plaintiff] failed to state First Amendment claims relating to his grievances ... because defendants' denial of his grievances did not state a substantive constitutional claim.").  "They are liable, however, for frustrating a prisoner's First Amendment right to access the courts."  *Barnett*, 414 Fed. App'x, at 787 (*citing Kensu v. Haigh,* 87 F.3d 172,

175 (6th Cir. 1996)).  Accordingly, for Defendants to merit summary judgment, the undisputed material facts must show that Plaintiff's access to the courts was not violated.

### iv. Plaintiff's Grievances

Plaintiff has made multiple claims regarding how his grievances were handled by USP officers and staff.  He argues that his right to grieve was blocked because two of his grievances were combined and responded to in one response; he was denied the right to address an issue with Casper and Turley; he was forced to withdraw a level-two grievance by Casper and Turley; and Casper told him that some issues ("The Board of Pardons and Parole, disciplinary, and classification") are not grievable.  (Second Am. Compl., Count 7, 17, 32, Doc. 8.)  Plaintiff also argues that his grievance about B-North's temperature issues was mishandled, in that it was opened by Officers Gallegos and Rigby.

Here, aside from general assertions, Plaintiff has not argued how the alleged violation of USP's grievance procedures actually injured his ability to pursue a non-frivolous legal claim. Even taking all Plaintiff's allegations as true as to the opening, delaying, or destruction of grievances, such actions do not rise to the level of a constitutional violation unless Plaintiff has suffered an actual injury to a non-frivolous legal claim. Because Plaintiff has failed to show such an injury, his allegations for violations of the grievance procedures fail as a matter of law.

### v. First Amendment Standard: Inmate Legal Materials

To state a claim upon which relief can be granted for a First Amendment violation based on the seizure of legal materials, an inmate must show that the defendant's actions inflicted an actual injury to plaintiff's non-frivolous legal claim.  *Clemmons v. Davies*, No. 94-3268, 86 F.3d 1166, at ¶ 15 (10th Cir. May 29, 1996) (unpublished) (citations omitted) ("[When] a prisoner

alleges that the seizure of legal materials has deprived him of his constitutional right of access to the court--but does not allege a complete denial of access to legal resources--he must establish that he has been prejudiced by the defendant's actions in order to prevail."). "[T]he prisoner's prosecution of the underlying action must be affirmatively hindered in some significant way; there must be actual substantial prejudice to specific litigation." *Id.* (citations and quotation marks omitted).

### vi. Plaintiff's Legal Materials

As with Plaintiff's other First Amendment claims, Plaintiff has failed to argue the essential element of an actual injury to a non-frivolous legal claim. Plaintiff states that his legal materials in his cell were read outside his presence. Defendants have offered declarations from prison employees and forms that show that Plaintiff had piles of paper in his cell, but none in the pouch provided by USP for the storing of legal materials, marked as legally privileged. This dispute is not material. Assuming Plaintiff's materials were in a pouch, and gone through by the prison guards and employees, Plaintiff's claim fails because he has not shown how that violation prejudiced a non-frivolous legal claim.

### vii. First Amendment Standard: Denial of Books and Magazine

Plaintiff's claims are about the denial of a legal dictionary and a legal self-help book, a magazine, and a shipment of books.

As to the legal books, "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis*, 518 U.S. at 351. "[M]eaningful access to the courts is the touchstone, and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the

library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* (internal quotation and citations omitted). Regarding the magazine and shipment of books, a prison's ban on sexually explicit material or nudity does not violate an inmate's First Amendment rights. *See Sperry v. Werholtz*, 413 Fed. App'x 31, 39-40 (10th Cir. 2011).

### viii. Denial of Plaintiff's Requests for Books and Magazine

Plaintiff contends that he was wrongfully denied a legal dictionary, a legal self-help book entitled *The Prisoner's Guide to Survival*, *Interview* magazine, and a shipment of three or four books. Defendants have argued that the items were properly denied: The dictionary did not come from an approved book vendor; the self-help book was not sent by an approved book vendor or bought using Plaintiff's inmate funds account; and the magazine and shipment of books were denied because they contain nudity and sexually explicit images and material.

Plaintiff has failed to argue with particularity that the denial of the legal self-help book and the legal dictionary hindered his efforts to pursue a legal claim. Plaintiff stated that "without such dictionary [Plaintiff] is unable to understand much of the legal terminology to present and argue an effective case, which [Plaintiff] was trying to do with *Losee v. Garden*." (Second Am. Compl., Count 18, p. 26, Doc. 8.) Regarding the self-help book, Plaintiff argued that "to deny such book impedes and hinders [Plaintiff]'s meaningful access to the courts . . . ." (*Id.* at Count 27, pp. 38–39.) Such general injuries are insufficient to state a claim upon which relief can be granted under the First Amendment.

Defendants argue, and Plaintiff does not dispute, that his other claims relate to materials that contain sexually explicit material and nudity: *Interview* magazine and *Glamour Photography*. *Glamour Photography* was in a shipment of books, and the entire shipment was

26

rejected and returned to sender per USP policy.  Plaintiff argues that publications may not be rejected solely because they contain sexual material.  (Second Am. Compl., Count 19, p. 28, Doc. 8) (citing 28 C.F.R. § 540.70–71).

Plaintiff's argument fails because federal regulations do not apply to state prisons, and because the Tenth Circuit has held that the denial of sexually explicit publications does not violate an inmate's First Amendment rights because it is rationally related to legitimate penological objectives.  *See Sperry*, 413 Fed. App'x, at 39-40.

### ix. Banned Publications List

Plaintiff claims that USP's use of a banned-publications list violates the First Amendment.  He argues that the list's existence directly violates 28 C.F.R. § 540.71, which states that "[t]he Warden may not establish an excluded list of publications. This means the Warden shall review the individual publication prior to the rejection of the publication."

As Defendants correctly note, 28 C.F.R. § 540.71 is a federal regulation, and applies only to federal prisons.  The definitions relevant to section 540.71 define "Warden" as "chief executive officer of a U.S. Penitentiary, Federal Correctional Institution, Medical Center for Federal Prisoners, Federal Prison Camp, Federal Detention Center, Metropolitan Correctional Center, or any federal penal or correctional institution or facility. Warden also includes any staff member with authority explicitly delegated by any chief executive officer."  28 C.F.R. § 500.1. "Institution" is defined as "a U.S. Penitentiary, a Federal Correctional Institution, a Federal Prison Camp, a Federal Detention Center, a Metropolitan Correctional Center, a Metropolitan Detention Center, a U.S. Medical Center for Federal Prisoners, a Federal Medical Center, or a Federal Transportation Center."  *Id.*  These definitions clarify that Chapter 28 of the Code of

27

Federal Regulations in general, and § 540.71 in particular, do not apply to Defendants because they do not refer to state prisons, their wardens, or their officials. Accordingly, Plaintiff's claim relating to the banned-publications list fails.

### D. Sixth Amendment Standard

Plaintiff has alleged multiple ways he believes his Sixth Amendment right has been violated. Plaintiff misunderstands the Sixth Amendment's application. Regarding the reading of an inmate's mail, "[a]s to the Sixth Amendment, its reach is only to protect the attorney-client relationship from intrusion in the criminal setting." *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974); *cf. Davis*, 99 Fed. Appx. at 841 n.6 (stating, although inmate characterized his claims as violations of the Fifth, Fourteenth, and Sixth Amendments, court would construe deprivation of access-to-courts claims as alleged violation of First and Fourteenth Amendments). Thus, Plaintiff's only Sixth Amendment claim regards interference with communication sent to his criminal attorney.

The elements of a Sixth Amendment violation based on interference with an inmate's right to communicate with a criminal attorney are: (1) plaintiff's legal mail was properly labeled to or from his criminal attorney, and (2) it was opened outside his presence. *See Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir. 2009). "Two or three pieces of mail opened in an arbitrary or capricious way suffice to state a claim." *Id.* (citations omitted).

### E. Plaintiff's Sixth Amendment Claims

Plaintiff alleges that he tried to mail a letter to his criminal attorney, but it was not mailed by Defendants, and was returned to him opened. (Second Am. Compl., Count X, pp. 18–19, Doc. 8.) Plaintiff and Defendants agree that the envelope was returned as a result of a postage

increase.  (*Id.*; Galetka Decl., ¶ 55, Ex. 5 to Defs.' *Martinez* Report.)  Plaintiff also asserts that Officer Gallegos interfered with letters sent by Plaintiff to solicit legal counsel for matters about Officer Gallegos.  (Am. Compl., Count 13, pp. 31–32, Doc. 8.)

Plaintiff's Sixth Amendment claims fail because Plaintiff has not alleged facts about an inability to communicate with counsel as to criminal matters.  Because Plaintiff is trying to state Sixth Amendment claims based on his inability to communicate with counsel about a civil case (namely, his possible claims against Officer Gallegos for the cold temperatures and mail problems) his claims must fail.  *See Al-Owhali v. Mukasey*, No. 07-CV-02214-LTB-BNB, 2010 WL 5651033 at \*\*11–12 (D. Colo. June 17, 2010) (unpublished), *report and recommendation adopted in part sub nom, Al-Owhali v. Holder*, 07-CV-02214-LTB-BNB, 2011 WL 288523 (D. Colo. Jan. 27, 2011), *aff'd*, 687 F.3d 1236 (10th Cir. 2012).

Additionally, an inmate's mail soliciting representation for legal problems does not qualify as privileged for First Amendment protection.  *See, e.g., Cotner v. Knight*, No. CIV-94-848-TS, 1995 U.S. Dist. LEXIS 15974, at \*17 (10th Cir. Feb. 13, 1995) (unpublished) (analyzing Oklahoma Department of Corrections policy).  Accordingly, Plaintiff's Sixth Amendment claims are denied.

### F. Fourteenth Amendment Standard

As to Plaintiff's claim that he was denied due process when he was denied a magazine, the Fourteenth Amendment requires that an inmate must have notice of the denial and the opportunity to be heard.  *Crozier v. Endel*, 446 Fed. Appx. 14, 15 (9th Cir. 2011) (unpublished).

**G. Denial of Plaintiff's Magazine**

Plaintiff does not plead many facts about his claim that he was wrongly denied a magazine. Plaintiff only states that he "received a notice of a denied publication on October 20, 2009 from Defendant Galetka . . . and was notified that such publication was added to the 'banned' list." (Am. Compl., Count 21, pp. 29–30, Doc. 8.) Plaintiff provided the notice as an exhibit to his Complaint. (Exs. to Compl., Attachment 7, Doc. 2.) The notice states that the denial may be appealed through the grievance procedure. (*Id.*) Defendants do not dispute any of Plaintiff's assertions of fact.

Plaintiff's Fourteenth Amendment right was not violated because he had notice of the denial, and an opportunity to appeal the decision and be heard regarding the denial. Accordingly, Plaintiff's Fourteenth Amendment claim fails as a matter of law.

**H. Retaliation Standard**

For an inmate to prevail on a retaliation claim for exercising his First Amendment right to file a grievance, the inmate "must prove that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). A retaliation claim "must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Id.* (emphasis in original). This can be done through circumstantial evidence such as suspicious timing of discipline, coincidental transfers of witnesses or assistants, and patterns of blocking access to legal materials. *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990). Regardless, if the inmate cannot prove that "the actual motivating factor behind defendants' actions was retaliation for his prior or current [grievances]" then he fails to state a claim for retaliation. *Id.* A prisoner asserting that he was retaliated

against "must present more than naked allegations of reprisal to survive [dismissal]." *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).

### I. Plaintiff's Retaliation Claim

Plaintiff alleges that he was retaliated against for filing grievances against housing officers. (Second Am. Compl., Counts 26, 28, 30, Doc. 8.) He states that he was moved from B-North, and twice lost his job as a tutor, in retaliation for filing grievances. (*Id.*) Plaintiff has not come forward with any evidence to contradict Defendant's argument that Plaintiff was fired due to unsatisfactory job performance.

The record shows unsatisfactory job performance to support Defendants' termination of Plaintiff's employment as a tutor. (Gardner Decl., ¶¶ 20–25, Ex. 7 to Defs.' *Martinez* Report; Bussio Decl., ¶ 9, Ex. 2 to Defs.' *Martinez* Report; C-Note Log, DOC – 000393, Ex. 20 to Defs.' *Martinez* Report.) Defendants' evidence indicates Plaintiff was not performing his duties and was difficult to work with. (*Id.*)

The Court finds that Plaintiff has failed to carry his burden showing a "but-for" retaliatory motive. *See Peterson*, 149 F.3d at 1144. Plaintiff's retaliation claims are dismissed with prejudice.

### J. Conclusion

Defendants have satisfied their burden on summary judgment of showing an absence of evidence to support Plaintiff's claims. Because Plaintiff has not presented sufficient evidence to show a genuine issue of fact remaining for trial, summary judgment for Defendants is appropriate. And, because Plaintiff has not shown that Defendants' actions violated any

constitutional right, the Court need not decide whether Defendants are entitled to qualified immunity.

## V. ORDER

Accordingly, **IT IS HEREBY ORDERED** that:

(1) Plaintiff's Motion for Discovery (Doc.126), Motion to Obtain Depositions (Doc. 138), and Motion to Compel Discovery (Doc. 143) are **DENIED**.

(2) Defendants' Motions for Summary Judgment (Docs. 86, 101) are **GRANTED**;

(3) All other pending motions is this case are **DENIED** as moot.

(4) This case is **CLOSED**.

Dated April 2, 2014.

BY THE COURT:

_Tena Campbell_
TENA CAMPBELL
United States District Judge